# Exhibit B

## United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:24–cv–01726–KNS

DAVID A. BIRDSELL v. THE EUCLID CHEMICAL
COMPANY et al
Assigned to: DISTRICT JUDGE KAI N. SCOTT
 related Case:  2:23–cv–04711–KNS
Cause: 15:1 Antitrust Litigation

Date Filed: 04/24/2024
Jury Demand: Plaintiff
Nature of Suit: 410 Other Statutes:
Anti–Trust
Jurisdiction: Federal Question

**Plaintiff**

**DAVID A. BIRDSELL**
*AS TRUSTEE OF THE ESTATE IN*
*BANKRUPTCY OF AGAVERO*
*READYMIX, LLCAND ON BEHALF OF*
*ALL OTHERS SIMILARLY SITUATED*

represented by **GERARD A. DEVER**
FINE, KAPLAN AND BLACK, RPC
One South Broad Street
23rd Floor
PHILA., PA 19107
215–567–6565
Fax: 215–568–5872
Email: gdever@finekaplan.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**THE EUCLID CHEMICAL
COMPANY**

**Defendant**

**RPM INTERNATIONAL INC**

**Defendant**

**COMPAGNIE DE SAINT–GOBAIN
S.A.**

**Defendant**

**SAINT–GOBAIN CORPORATION**

**Defendant**

**CHRYSO, INC.**

**Defendant**

**GCP APPLIED TECHNOLOGIES,
INC.**

**Defendant**

**SIKA CORPORATION**

**Defendant**

**SIKA AG**

**Defendant**

**CINVEN LTD.**

**Defendant**

**CINVEN, INC.**

**Defendant**

**MASTER BUILDERS SOLUTIONS
DEUTSCHLAND GMBH**

**Defendant**

**MASTER BUILDERS SOLUTIONS
ADMIXTURES U.S., LLC**

**Defendant**

**DOES 1– 10**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/24/2024 | 1 | COMPLAINT against DAVID A. BIRDSELL ( Filing fee $ 405 receipt number APAEDC–17421968.), filed by DAVID A. BIRDSELL. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Designation Form Designation Form)(DEVER, GERARD) (Entered: 04/24/2024) |
| 04/25/2024 | 2 | Summons Issued as to CHRYSO, INC., CINVEN LTD., CINVEN, INC., COMPAGNIE DE SAINT–GOBAIN S.A., GCP APPLIED TECHNOLOGIES, INC., MASTER BUILDERS SOLUTIONS ADMIXTURES U.S., LLC, MASTER BUILDERS SOLUTIONS DEUTSCHLAND GMBH, RPM INTERNATIONAL INC, SAINT–GOBAIN CORPORATION, SIKA AG, SIKA CORPORATION and THE EUCLID CHEMICAL COMPANY. Forwarded To: counsel on 4/25/24. (mbh) (Entered: 04/25/2024) |
| 04/25/2024 | 3 | Disclosure Statement Form pursuant to FRCP 7.1 by DAVID A. BIRDSELL.(DEVER, GERARD) (Entered: 04/25/2024) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID A. BIRDSELL, AS TRUSTEE OF
THE ESTATE IN BANKRUPTCY OF
AGAVERO READYMIX, LLC AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

                        *Plaintiff*,

v.

THE EUCLID CHEMICAL COMPANY;
RPM INTERNATIONAL INC.;
COMPAGNIE DE SAINT-GOBAIN S.A.;
SAINT-GOBAIN CORPORATION;
CHRYSO, INC.; GCP APPLIED
TECHNOLOGIES, INC.; SIKA
CORPORATION; SIKA AG; CINVEN,
LTD.; CINVEN, INC.; MASTER
BUILDERS SOLUTIONS DEUTSCHLAND
GMBH; MASTER BUILDERS SOLUTIONS
ADMIXTURES U.S., LLC; AND DOES 1-
10,

                        *Defendants.*

Case No. _____

**Jury Trial Demanded**

## CLASS ACTION COMPLAINT

1

Plaintiff David A. Birdsell, the duly appointed and acting Trustee of the Chapter 7 bankruptcy estate of Agavero Readymix, LLC ("Agavero" or "Plaintiff"), and on behalf of all others similarly situated (the "Class," as defined below), upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demands a trial by jury on all matters so triable.

## I.  NATURE OF THE ACTION

1. This lawsuit arises from Defendants' unlawful agreement to fix the prices for: (a) chemical admixtures for concrete, (b) chemical additives for cement, (c) chemical admixtures for mortar, and (d) products containing or bundled with any of these (collectively, "CCAs").

2. Globally, the market for CCAs exceeded $19 billion in 2022[1] and is projected to reach $27.4 billion by 2032.[2]

3. Defendants—Sika AG and Sika Corporation (collectively, "Sika"); Chryso, Inc. ("Chryso") and GCP Applied Technologies, Inc. ("GCP"), under the ownership and control of Compagnie de Saint-Gobain S.A. and Saint-Gobain North America ("Saint-Gobain," and with Chryso and GCP, collectively "Saint-Gobain Group"); Master Builders Solutions Admixtures U.S., LLC, ("MBSA"), under the ownership and control of Master Builders Solutions Deutschland GmbH ("MBSD"), Cinven Ltd., and Cinven, Inc. ("Cinven," collectively "Master Builders

---

[1] Fortune Business Insights, *Concrete Admixtures Market Size* (Jan. 2022), https://www.fortunebusinessinsights.com/concrete-admixtures-market-102832 (last visited Apr. 11, 2024).

[2] Globe Newswire, *Concrete Admixture Market is projected to reach US $27.4 Billion with a Share of 36.1%, by 2032* (July 13, 2022), https://www.globenewswire.com/en/news-release/2022/07/13/2479255/0/en/Concrete-Admixture-Market-is-projected-to-reach-US-27-4-Billion-with-a-Share-of-36-1-by-2032-Future-Market-Insights-Inc.html (last visited Apr. 11, 2024).

ALM | LAW.COM RADAR

Group"); and The Euclid Chemical Company ("Euclid"), under the ownership and control of RPM International Inc. ("RPM," and with Euclid, "Euclid Group")—manufacture and sell the vast majority of CCAs sold in the United States.

4.     The roots of Defendants' conspiracy reach back to 2014, when Sika's founding family, the Burkard family, sought to sell their controlling stake in the company to Saint-Gobain. Sika management viewed this as a hostile takeover and, together with key shareholding groups, launched a campaign to block the deal. The Burkards attempted to replace the dissenting board members but were thwarted by the other shareholders who reduced the Burkards' voting rights. A truce was announced on May 11, 2018 when the two companies reached an agreement whereby Saint-Gobain sold 15.2 million of its shares in Sika, leaving it with a 10.75% stake but not control.

5.     At the time Saint-Gobain launched its takeover attempt, the CCA industry had all the hallmarks of an industry highly susceptible to collusion[3] because the supply side was already heavily concentrated with high barriers to entry and the demand side was unconcentrated and inelastic. Having resolved their differences in May 2018, Sika and Saint-Gobain were free to leverage these susceptibilities by agreeing not to compete with one another, thus ensuring each could charge higher prices for CCAs. In order to strengthen the grip of the conspiracy against potentially uncooperative competitors, the two companies embarked on a worldwide buying spree, ultimately purchasing no fewer than a half-dozen of their shared competitors between 2017 and the present. This agreement was aided and abetted at all times by Cinven, with Euclid Group thereafter joining the conspiracy.

---

[3]     *See* ANTITRUST DIVISION, U.S. DEP'T OF JUSTICE, *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, An Antitrust Primer*, at 5-6 (Revised Feb. 2021) (hereinafter, "DOJ ANTITRUST PRIMER"), https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf (last visited Apr. 11, 2024).

6.     The onset of Covid-19 in 2021, supercharged Defendants' conspiracy. With no meaningful check on their pricing power, Defendants agreed to institute (a) price increases on the CCAs, and (b) surcharges on top of those price increases, including shipping surcharges and raw material surcharges.

7.     Defendants' unlawful agreement caused direct purchasers of CCAs in the United States and its territories, including Agavero and the Class, to pay supra-competitive prices for CCAs sold by Defendants in the United States and its territories from the period beginning no later than May 11, 2018 and running through the date on which the Class is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Defendants' scheme included both price increases and the imposition of surcharges on CCAs sold in the United States.

8.     On October 17, 2023, the European Commission ("EC") announced that, together with the United Kingdom's Competition and Markets Authority ("CMA") and the Turkish Competition Authority ("TCA"), it had carried out surprise antitrust inspections of "companies active in the construction chemicals sector in several Member States."[4] This type of inspection is called a "dawn raid."

9.     That same day, the CMA released a statement that it had "launched an investigation … into suspected anti-competitive conduct relating to the supply of chemical admixtures and

---

[4]     Press Release, *Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector*, EUROPEAN COMMISSION (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061 (hereinafter, "EC Oct. 17 Press Release") (last visited Apr. 11, 2024).

additives for use in concrete, cement, mortars and related construction products in the UK."[5]

10.     Both the EC and CMA have confirmed that they are working with the United States Department of Justice's Antitrust Division ("DOJ") in connection with these dawn raids, thus indicating that the anticompetitive conduct in question also extended into the United States.[6]

11.     It was revealed that Sika, Saint-Gobain Group, and Master Builders Group are targets in this global antitrust investigation.[7] It was also revealed that Sika and Saint-Gobain Group are cooperating with these global antitrust authorities,[8] and that Sika had been in contact with the DOJ.[9]

12.     Beginning no later than May 11, 2018, Defendants entered into an agreement to charge supra-competitive prices for CCAs through price increases and the imposition of surcharges. This agreement resulted in Agavero and members of the Class paying supra-competitive prices for CCAs in the United States and its territories.

---

[5]     Competition and Markets Authority, *Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry*, GOV.UK (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry (hereinafter, "CMA Oct. 17 Statement") (last visited Apr. 11, 2024).

[6]     Jonathan Knott, *Competition Regulators Probe Concrete Additive Firms,* CONSTRUCTION NEWS (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/ (last visited Apr. 11, 2024); EC Oct. 17 Press Release, *supra* note 4.

[7]     Lexology, *UPDATE: Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe* (Oct. 18, 2023), https://www.lexology.com/pro/content/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe (last visited Apr. 11, 2024).

[8]     Knott, *supra* note 6.

[9]     Tom Brown, *EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation,* INDEPENDENT COMMODITY INTELLIGENCE SERVICES (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chemsantitrust-investigation/ (last visited Apr. 11, 2024).



## II.    JURISDICTION AND VENUE

13.    Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

15.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## III.    PARTIES AND UNNAMED CO-CONSPIRATORS

### A.    Plaintiff

16.    Plaintiff David A. Birdsell is the duly appointed and acting Trustee of the Chapter 7 estate of Agavero. Agavero's bankruptcy was commenced by a voluntary Petition filed on November 9, 2021. Agavero was an Arizona limited liability company with its principal place of business at 7514 S. 22nd Ln., Phoenix, Arizona 85041.

17.    During the Class Period, Agavero purchased CCAs in the United States or its territories at supra-competitive prices directly from one or more of the Defendants.

### B.    Defendants

#### 1.    Euclid Group

18.    Defendant Euclid is an Ohio corporation with its primary place of business at 19215

6

Redwood Rd, Cleveland, Ohio 44110. Euclid has multiple locations in the United States and throughout the world.[10] During the Class Period, Euclid manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

19.     Defendant RPM is a Delaware corporation with its primary place of business at 2628 Pearl Road, Medina, Ohio 44256. During the Class Period, RPM manufactured and sold CCAs around the world, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including Euclid.

20.     Euclid is a wholly owned subsidiary of RPM. RPM controls Euclid both generally and with respect to the conduct of Euclid in furtherance of the unlawful acts alleged in this Complaint.

21.     Euclid and RPM are collectively referred to herein as "Euclid Group."

### 2.     *Saint-Gobain Group*

22.     Defendant Compagnie de Saint-Gobain S.A. ("Saint-Gobain S.A.") is a French corporation with its primary place of business at Tour Saint-Gobain, 12 Place de l'Iris Courbevoie, Ile-De-France, 92400 France. During the Class Period, Saint-Gobain Group manufactured and sold CCAs around the world, including in the United States and its territories, both directly and through its predecessors, affiliates, and/or subsidiaries, including Saint-Gobain Corporation, Chryso, and GCP. Siant-Gobain S.A. has approximately 120 manufacturing sites throughout North America, including approximately 100 in the United States, four (4) of which are in Pennsylvania.[11]

23.     Defendant Saint-Gobain Corporation operates in North America and is a

---

[10]     EUCLID CHEMICAL, *Euclid Worldwide*, https://www.euclidchemical.com/company/euclid-worldwide/ (last visited Mar. 4, 2024).

[11]     SAINT-GOBAIN, Manufacturing Sites, https://www.saint-gobain-northamerica.com/manufacturing-sites (last visited Apr. 11, 2024).

ALM | LAW.COM RADAR

Pennsylvania corporation with its primary place of business at 20 Moores Rd., Malvern, Pennsylvania, 19355. Saint-Gobain Corporation lists Chryso and GCP as its subsidiaries. On information and belief, during the Class Period, Saint-Gobain Corporation, Chryso, and GCP all became part of Saint-Gobain S.A.'s "High Performance Solutions" unit, which manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

24.     Defendant Chryso is a Michigan corporation with its primary place of business in the United States at 1611 Highway 276, Rockwall, TX 75032. As of 2023, Chryso is identified as one of Saint-Gobain Corporation's subsidiaries and affiliates. With over 1,200 staff worldwide, Chryso has twenty (20) foreign subsidiaries and serves customers in more than one hundred (100) countries, including four (4) in the United States.[12] During the Class Period, Chryso manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

25.     Defendant GCP is a Georgia corporation with its primary place of business at 2325 Lakeview Parkway, Suite 450 Alpharetta, GA 30009. GCP is identified as of 2023 as one of Saint-Gobain Corporation's subsidiaries and affiliates. GCP employs roughly 2,000 people in more than 50 manufacturing facilities worldwide, and serving customers in more than 100 countries, including in the United States.[13] During the Class Period, GCP manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

---

[12]     CHRYSO, International Network, https://www.chryso.com/international-network/ (last visited Mar. 4, 2024).

[13]     GCP APPLIED TECHNOLOGIES, *Contact Us*, https://gcpat.com/en/about/contact-us (last visited Apr. 11, 2024).

26.     Saint-Gobain Corporation, Chryso, and GCP are wholly owned subsidiaries of Compagnie de Saint-Gobain S.A., which controls Saint-Gobain Corporation, Chryso, and GCP both generally and with respect to their conduct in furtherance of the unlawful acts alleged in this Complaint.

27.     Saint-Gobain S.A. and its United Sates operations, Saint-Gobain Corporation, Chryso, Inc., and GCP Applied Technologies, Inc. are collectively referred to herein as "Saint-Gobain Group."

### 3.     Sika

28.     Defendant Sika Corporation is a New Jersey corporation with its primary place of business at 201 Polito Ave, Lyndhurst, New Jersey, 07071. During the Class Period, Sika Corporation manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

29.     Defendant Sika AG is a Swiss corporation with its primary place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and sold CCAs around the world, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries, including Defendant Sika Corporation.

30.     Sika Corporation is a wholly owned subsidiary of Sika AG. Sika AG controls Sika Corporation both generally and with respect to the conduct of Sika Corporation in furtherance of the unlawful acts alleged in this Complaint.

31.     Sika AG and Sika Corporation are collectively referred to herein as "Sika."

### 4.     Master Builders Group

32.     Defendant Cinven Ltd. is a British corporation with its primary place of business at 21 St. James's Square, London, SW1Y 4JZ, United Kingdom. Cinven Ltd. manufactures and

sells CCAs around the world, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including Cinven, Inc., MBSD, and MBSA.

33.     Defendant Cinven, Inc. is a New York corporation with its primary place of business at Tower 49, 12 East 49th Street, New York, NY 10017.[14] Cinven Inc. manufactures and sells CCAs around the world, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including MBSA. Defendants Cinven Ltd. and Cinven Inc. are collectively referred to herein as "Cinven."

34.     Defendant MBSD is a German corporation with its primary place of business at Glücksteinallee 43-45, 68163 Mannheim, Germany. During the Class Period, MBSD manufactured and sold CCAs around the world, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including MBSA. Indeed, the CEO of MBSA, Borris Gorella, is the Managing Director of MBSD's parent company, Master Builders Solutions Holdings GmbH.

35.     Defendant MBSA is a Delaware corporation with its primary place of business at 23700 Chagrin Blvd., Beachwood, Ohio, 44122. MBSA has two (2) locations in the United States.[15] During the Class Period, MBSA manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

36.     MBSD and MBSA are wholly owned subsidiaries of Cinven. Cinven controls MBSD and MBSA both generally and with respect to the conduct of MBSD and MBSA in furtherance of the unlawful acts alleged in this Complaint.

---

[14]     CINVEN, *Locations*, https://www.cinven.com/site-tools/cinven-offices (last visited Apr. 11, 2024).

[15]     MASTER BUILDERS SOLUTIONS, *Our Locations*, https://www.master-builders-solutions.com/about-us/our-locations (last visited Apr. 11, 2024).

37.     MBSD, MBSA, and Cinven are collectively referred to herein as "Master Builders Group."

### 5.     *Doe Defendants*

38.     Doe Defendants 1-10 are members of the price-fixing conspiracy alleged herein whose identities are presently unknown to Plaintiff. These include, among other entities, the various "industry bodies" referenced in the CMA's statement regarding its investigation. Plaintiff expects that the identity of these Doe Defendants will be revealed during discovery, at which point Plaintiff will seek leave to amend its complaint to add those entities in place of the Doe Defendants.

### C.     <u>Agents and Unnamed Co-Conspirators</u>

39.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

40.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

41.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## IV.     <u>FACTUAL ALLEGATIONS</u>

### A.     CCAs Generally

42.     Construction chemicals play important roles in all sorts of construction projects, be they industrial, residential, or commercial, including the construction of bridges, roads, and other infrastructure.

43.     These chemicals are added to concrete, cement, and mortar to achieve important

qualities such as safety, workability, and durability.

44.     *Concrete* is a vital material used extensively in construction projects. It is made by mixing aggregate, cement, small stones, sand, gravel, and water, which bond together to create a stone-like material.[16] Concrete is "plastic and malleable when newly mixed" but "strong and durable when hardened" and one of the most-produced materials on Earth.[17]

45.     *Cement* is made from limestone, shells, marl, or chalk, combined with clay, shale, slate, sand, iron slag, or bauxite, heated to a high temperature to form a rock-like substance that is ground into a fine powder.[18] Cement is used in construction because of its versatility, making it a popular choice for domestic and industrial construction projects.

46.     *Mortar* is "the bonding agent that integrates unit masonry into a wall" and "must be durable enough to keep the wall together and built to withstand the forces of wind-driven rain, temperature extremes, and other weather conditions."[19]

---

[16]     *Concrete in Construction: Uses, Advantages, and Types*, PRO CREW SCHEDULE (April 9, 2020), https://procrewschedule.com/concrete-in-construction-uses-advantages-and-types/ (last visited Apr. 11, 2024).

[17]     PCA, *Cement & Concrete,* cement.org/cement-concrete (last visited Apr. 11, 2024).

[18]     PCA, *How Cement is Made*, cement.org/cement-concrete/how-cement-is-made (last visited Apr. 11, 2024).

[19]     CTL ENGINEERING, *Mortar Types vs Categories: What's the Difference?*, https://ctleng.com/mortar-types-vs-categories-whats-the-difference/ (last visited Apr. 11, 2024).

47.     The figure below illustrates the differences between and uses of concrete, cement, and mortar:[20]



48.     The construction chemical industry plays a vital role in the development of infrastructure, including roads, bridges, tunnels, airports, seaports, power plants, and other facilities that enable economic activity and enhance the quality of life.[21]

---

[20]     NEW INFARRANTLY CREATIVE, https://www.infarrantlycreative.net/does-mortar-stick-to-wood-faqs/ (last visited Apr. 11, 2024).

[21]     *The Role of Construction Chemicals in Infrastructure Development,* CCI, (March 6, 2023), https://ccichemicals.in/blog-details/the-role-of-construction-chemicals-in-infrastructure-development (last visited Apr. 11, 2024).

49.    The different uses for construction chemicals are illustrated in the figure below.[22]



50.    CCAs include (a) concrete admixtures, (b) cement additives, and (c) admixtures for

mortar. The CMA has described the uses for each as follows:

> Chemical admixtures are specially formulated chemicals added to
> cementitious products (concrete, cement, and mortar) to modify
> their properties, for example to slow their setting rate so they can be
> transported over longer distances. Chemical admixtures also enable
> concrete producers to reduce the amount of cement required to
> produce concrete, which not only cuts the overall cost of concrete
> production, but also reduces its environmental impact. Modern
> construction methods rely on admixtures, which are therefore
> considered an essential input in the production of cementitious
> products.[23]

51.    CCAs are made by "blending polymers and other chemicals together. The CMA

found that some larger chemical admixture suppliers have their own polymer production facilities,

---

[22]    M. Harini Athithya *et al.*, *Role of chemicals in construction*, slide 4 (March 6, 2020),
https://www.slideshare.net/SusukoChin/role-of-chemicals-in-construction (last visited Apr. 11,
2024).

[23]    *Anticipated acquisition by Sika AG of MBCC Group*, *Decision on relevant merger
situation and substantial lessening of competition,* U.K. COMPETITION AND MARKETS
AUTHORITY, at 2 (Jul. 27, 2022),
https://assets.publishing.service.gov.uk/media/632c80f78fa8f51d2cfed942/220727_Sika-
MBCC_Decision_FINAL2.pdf (hereinafter, "CMA Phase 1 Decision")(last visited Apr. 11,
2024).

while other suppliers purchase polymers from large chemical companies."[24]

52.     Manufacturers of CCAs use the same type of production equipment and chemicals to produce these CCAs, so they can quickly and cost-effectively shift production from one category of CCA to another.[25]

53.     Most CCAs are supplied in ready-to-use liquid form and are added to the concrete at the plant or at the jobsite.[26]

54.     Purchasers of CCAs operate in the construction and industrial sectors and include producers of ready-mixed concrete, shotcrete,[27] and precast concrete.[28] The CMA found that purchasers of CCAs typically purchase the majority of their CCAs from a single supplier.[29]

55.     The United States construction chemicals market was $11.39 billion in 2022 and is projected to reach $19.24 billion by 2031.[30]

56.     Defendants are the dominant manufacturers and sellers of CCAs in the world, and in the United States and its territories. Purchasers of CCAs in the United States and its territories import them directly from the foreign Defendants (*e.g.*, Compagnie de Saint-Gobain S.A., Sika

---

[24]     *Id*. at 9.

[25]     *Id.* at 14.

[26]     PCA, *Chemical Admixtures*, https://www.cement.org/cement-concrete/concrete-materials/chemical-admixtures (last visited Apr. 11, 2024).

[27]     Shotcrete (or gunite) is a type of ready-mixed concrete that, instead of being poured and spread, is fed through a hose and applied using a high-pressure sprayer. It is typically used for concrete walls, such as in tunnels.

[28]     SIKA USA, *A Complete Range of Concrete Admixtures*, https://usa.sika.com/en/construction/concrete/concrete-admixtures.html (last visited Apr. 11, 2024).

[29]     CMA Phase 1 Decision, *supra* note 25, at 11-12.

[30]     Growth Markets Reports, *United States Construction Chemicals Market*, https://growthmarketreports.com/report/construction-chemicals-market-united-states-industry-analysis (last visited Apr. 11, 2024).



AG, and MBSD) and buy them from their domestic subsidiaries (*e.g.*, Sika Corp., Chryso, GCP, and MBSA).

57. CCAs sold by Sika in the United States and its Territories include:[31]

| Water Reduction and Workability: | Durability Enhancement | Drycast |
|---|---|---|
| Plastocrete® 161 | Sika® Air | SikaMix® PL-100 |
| Plastocrete® 10N | Sika® AEA-14 | SikaMix® BF3 |
| Plastocrete® 250 | Sika® Multi Air-25 | SikaMix® HC-300 |
| SikaPlast®-200 | Sika® Air-260 | SikaMix® AE-3 |
| SikaPlast®-300 GP | Sika® Air-360 | SikaMix® AE-6 |
| Sikament® AFM | Sika® FerroGard®-9015 | SikaMix® W-10 |
| Sikament® 475 | Sika® CNI | SikaMix® W-10 M |
| Sikament® 686 | Sika® Control-220 | |
| Sikament® 610 | Sika® Control-75 | **Specialty Products** |
| Sika® ViscoCrete® -1000 | Sika® Control-NS | Sikament®-100 SC |
| Sika® ViscoCrete® -2100 | Sikacrete®- 950DP | Sika® Stabilizer- 4R |
| Sika® ViscoCrete® -4100 | Sikacrete® M-100 | Sika® Lightcrete Powder |
| Sika® ViscoCrete® -6100 | Sika® Control ASR | Sika® Lightcrete Liquid |
| Sika® ViscoCrete® -2110 | | Sila® Perfin-305 |
| Sikament® SPMN | **Watertight Applications:** | Sigunit® -L72 AF |
| ViscoCrete®-125P | Sika® Watertight Concrete Powder | Sika® Rugasol-S |
| Sika® ViscoCrete®- 225 P | Sika® WT-215 P | SikaFilm® |
| Sika® ViscoFlow® -2020 | | |
| | | **Fibers:** |
| **Set Control:** | | SikaFiber® |
| Plastiment® XR | | SikaFiber® Force |
| Plastiment® | | |
| SikaTard® 440 | | |
| SikaSet® NC | | |
| SikaSet® NC-4 | | |
| SikaSet® HE | | |
| Plastocrete® 161 HE | | |
| Sika® Rapid-1 | | |

58. CCAs sold by Saint-Gobain Group (Chryso) in the United States and its territories include water reducing admixtures such as Chryso® Optima 249; Chryso® Fluid Optima 256 EMX;

---

[31] SIKA, *Concrete Admixture Product Guide,* https://usa.sika.com/dam/dms/us01/7/Concrete%20Admixture%20Product%20Guide.pdf (last visited Apr. 11, 2024).

Chryso® Fluid Optima 258 EMX; Chryso® Optima 1240; Chryso® Optima 1311; Chryso® Optima 1130; Chryso® Quad 842; Chryso® Quad 715; Chryso® Quad 855 EMx; Chryso® Quad 520 EMx; Chryso® EnviroMix® 310; Chryso® EnviroMix® 740; Chryso® EnviroMix® 300; Chryso® EnviroMix® 728; Chryso® EnviroMix® 330; Chryso® EnviroMix® 350; Chryso® Turbocast accelerators; Retarder & Hydration Stabilizers; Air Entrainers; and Strength Enhancing Admixtures.[32]

59.     CCAs sold by Saint-Gobain Group (GCP) in the United States and its territories include the ADVA® product line, CONCERA® product line, DARACEM® product line, EXP® product line, CLARENA® product line, MIRA® product line, TB® product line, WRDA® product line, ZYLA® product line, DARASET® PolarSet® product line, AIRALON® product line, DARAVAIR® product line, DAREX® product line, DARAPEL® product line, DCI® product line, ECLIPSE® product line, FORCE® product line, HRMK® product line, and POSTRITE® product line.[33]

60.     CCAs sold by Cinven Group in the United States and its territories include the MasterPozzolith, Master Polyheed, Master Glenium, Master Rheobuild, MasterSet, MasterAir, MasterCell, MasterSure, MasterMatrix, MasterLife, Master X-Seed, and MasterSune product lines.[34]

---

[32]     CHRYSO SAINT-GOBAIN, https://www.chrysoinc.com/catalog/high-range-water-reducing-admixtures/; https://www.chrysoinc.com/catalog/multi-range-water-reducing-admixtures/; https://www.chrysoinc.com/catalog/full-range-water-reducers/; https://www.chrysoinc.com/catalog/accelerators-ready-mix/; https://www.chrysoinc.com/catalog/ready-mix-concrete/ (last visited Apr. 11, 2024).

[33]     GCP APPLIED TECHNOLOGIES, *Concrete Admixtures,* https://gcpat.com/en/concrete/admixture (last visited Apr. 11, 2024).

[34]     MASTER BUILDER SOLUTIONS, *Admixture Performance Guide For Improving Concrete,* https://assets.master-builders-solutions.com/en-us/mbs-admixture-performance-guide.pdf (last visited Apr. 11, 2024).

61. CCAs sold by the RPM Group in the United States and its territories include the Accelguard® product line, the Eucon™ product line, and the Plastol™ product line.[35]

**B.** **Global Antitrust Investigations into Defendants' Anticompetitive Conduct**

62. The EC announced on October 17, 2023 that it had carried out dawn raids at several firms active in the construction chemicals industry:

> The European Commission is carrying out unannounced antitrust inspections at the premises of companies active in the construction chemicals sector in several Member States.
>
> ***The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices*** (Article 101 of the Treaty on the Functioning of the European Union).
>
> The construction chemicals concerned by the inspection are chemical additives for cement and chemical admixtures for concrete and mortar. These are ingredients that are added to cement, concrete and mortar to modify and improve their properties and provide them with specific qualities.
>
> The Commission officials were accompanied by their counterparts from the relevant national competition authorities of the Member States where the inspections were carried out. Today's inspections were conducted in coordination with the UK Competition and Markets Authority and the Turkish Competition Authority. The Commission has also been in contact with the United States Department of Justice, Antitrust Division.[36]

63. That same day, the U.K. Competition and Markets Authority ("CMA") confirmed its participation in the investigation:

---

[35] THE EUCLID CHEMICAL COMPANY, *Concrete & Masonry Admixture & Fiber Products,* https://www.euclidchemical.com/fileshare/Literature/Euclid-Chemical-Admix-and-Fiber-Catalog.pdf (last visited Apr. 11, 2024).

[36] EC Oct. 17 Press Release, *supra* note 4 (emphasis added).



The CMA has launched an investigation into suspected anti-competitive conduct in relation to the supply of chemicals for use in the construction industry.

**The Competition and Markets Authority (CMA) has reason to suspect anti-competitive behaviour has taken place involving a number of suppliers of these chemicals and some industry bodies.** This conduct relates to the supply of chemical admixtures and additives which are an essential input for products like concrete, mortars and cement used in the construction industry.

The CMA is working closely with the European Commission, which has also launched an investigation into suspected anticompetitive conduct in the sector today. **The CMA is also in contact with other authorities, including the United States Department of Justice, Antitrust Division.**[37]

64.     In announcing the coordinated dawn raids, the CMA stated that "[t]he investigation concerns a suspected infringement or infringements of Chapter I CA98 [the Competition Act] involving a number of suppliers of these chemicals and **some industry bodies.**"[38]

65.     The following day, October 18, 2023, the EC, CMA, and the Turkish Competition Authority ("TCA") confirmed their involvement in the investigation and provided further details:

> Competition authorities in the EU, UK and Turkey have launched an antitrust investigation into players in the construction chemicals sector, carrying out unannounced inspections at the premises of companies this week. The European Commission, UK Competition and Markets Authority, and Turkey's Competition Authority launched investigations, citing concern that companies in the sector may have violated EU antitrust rules prohibiting cartels and restrictive business practices.
>
> The Commission has also been in contact with the US Department of Justice. The focus of the investigation is on chemical additives for cement and admixtures for concrete and mortar.
>
> **Switzerland-based construction chemicals major Sika said that**

---

[37]     News story, *CMA launches investigation into the supply of chemicals for use in construction industry*, GOV.UK (Oct. 17, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-the-supply-of-chemicals-for-use-in-construction-industry (emphasis added) (last visited Apr. 11, 2024).

[38]     CMA Oct. 17 Statement, *supra* note 5 (emphasis added) (last visited Apr. 11, 2024).

> *authorities from the three involved state bodies had visited some of its premises, and that contact with US antitrust authorities has been established. … A spokesperson for France-based construction chemicals major Saint-Gobain confirmed by phone that the company is aware of and cooperating with the investigation.*[39]

66.      Sika, Saint-Gobain Group, and Master Builders Group have all confirmed that they are subjects of the investigation.[40]

67.      On October 18, 2023, Sika confirmed the investigation in a statement to Construction News ("CN"): Sika confirmed to CN that inspections had taken place into "suspected antitrust irregularities in the area of additives for concrete and cement."[41] Construction News reported:

> The investigations relate to chemical admixtures and additives for concrete, mortar and cement. Two firms have so far confirmed they are cooperating with investigators.
>
> The CMA said that it suspects anticompetitive behaviour may have taken place involving unspecified "industry bodies" and companies supplying chemicals to the construction industry.
>
> The UK watchdog's investigation is being coordinated with a simultaneous probe from the EC, which said it had carried out unannounced antitrust inspections at "companies active in the construction chemicals sector in several member states."
>
> The EC said it had concerns that the companies inspected "may have violated EU antitrust rules that prohibit cartels and restrictive business practices."

---

[39]      Tom Brown, *EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation,* INDEPENDENT COMMODITY INTELLIGENCE SERVICES (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chemsantitrust-investigation/) (emphases added) (last visited Apr. 11, 2024).

[40]      Alex Bagley, *UPDATE: Sika, Saint-Gobain and Cinven-owned business targeted in cross-border cartel probe,* GLOBAL COMPETITION REVIEW (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe (last visited Apr. 11, 2024).

[41]      Knott, *supra* note 6.



An initial CMA investigation – including information-gathering, analysis and review of information gathered – will last until July 2024. The competition watchdog may then issue a statement of objections if it decides competition law may have been infringed.

French company Saint-Gobain and Swiss firm Sika have confirmed that they are cooperating with inspections. Switzerland is not an EU member state but the two parties signed a deal in 2014 to cooperate on competition issues.

In a statement, Saint-Gobain said it was "aware of and cooperating with" competition law investigations in the EU, the UK and Turkey.

The company confirmed that inspections had taken place at its construction chemicals business unit site in Turkey. It said this unit "is and has always been fully committed to competition law compliance and is cooperating with the investigations."

Sika confirmed to CN that inspections had taken place into "suspected antitrust irregularities in the area of additives for concrete and cement,"

. . . .

The EC said its inspections on 17 October "were conducted in coordination with the UK CMA and the Turkish Competition Authority," adding that it had also been in contact with the US Department of Justice's Antitrust Division.

The CMA said it was "working closely" with the EC and was also in contact with other authorities, such as those in the US.

In 2021, the CMA raised concerns relating to Sika's planned purchase of German chemicals supplier MBCC, given that the companies were the two-largest UK suppliers of chemical admixtures.[42]

68.　On October 18, 2023, Saint-Gobain Group confirmed its cooperation, saying: "We can confirm that Saint-Gobain is aware of competition law investigations and cooperating with

---

[42]　*Id.*



these investigations."[43]

69.     That same day, Master Builders Group confirmed the investigation by the EC.[44]

70.     Inspections are typically done by an order of the EC, and the EC "must have reasonable grounds for suspecting an infringement of the competition rules; it must be borne in mind that   the inspections carried out by   the   [EC]   are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[45]

71.     There is also a United States Department of Justice ("DOJ") investigation of the industry in coordination with the European investigations. On February 23, 2024, Cemex S.A.B. de C.V. ("Cemex"),  a Mexican multinational building materials company, reported that "[t]he European Commission has inspected Cemex's offices in France and requested certain information relating to the business in France in the construction chemicals sector, which includes chemical admixtures and additives for use in concrete, cement and related construction products." [46] Cemex further reported that its "operations in the United States received a grand jury subpoena issued by the DOJ in connection with an investigation of possible antitrust law violations in the cement additives and concrete admixtures sector" and that Cemex was "fully cooperating with the

---

[43]     Foo Yun Chee, *St Gobain says cooperating in EU probe into construction chemicals cartel*, REUTERS, https://www.nasdaq.com/articles/st-gobain-says-cooperating-in-eu-probe-into-construction-chemicals-cartel (Oct. 18, 2023, 8:49 am EDT) (last visited Apr. 11, 2024).

[44]     Bagley, *supra* note 42.

[45]     *See In re: Farm-Raised Salmon and Salmon Prod's Antitrust Litig.*, No. 19-21551, 2021 WL 1109218 at *3 (S.D. Fla. Mar. 23, 2021).

[46]     Cemex, S.A.B. de C.V. Form 6-K, at pg. 51 (Feb. 23, 2024), *available at* https://www.sec.gov/Archives/edgar/data/1076378/000119312524044655/d747690dex1.htm (last visited Apr. 11, 2024).



authorities conducting this investigation."[47]

72.     The DOJ has noted that "[c]ollusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another." [48]

73.     Defendants share overlapping membership in a number of local and international CCA trade associations that afforded Defendants the opportunity to meet and conspire in furtherance of their agreement to fix prices for CCAs.

74.     For example, Defendants Sika, Saint-Gobain Group, and Master Builders Group are members of the Belgian CCA trade association ("FIPAH");[49] the Norwegian CCA trade association ("NCCA");[50] the Spanish CCA trade association ("NFAH");[51] the French CCA trade association ("SYNAD");[52] the Italian CCA trade association ("ASSIAD");[53] the Swedish CCA trade association ("SACA");[54] the UK CCA trade association ("CAA");[55] and the Turkish CCA

---

[47]     *Id.*

[48]     DOJ ANTITRUST PRIMER, *supra* note 3, at 6.

[49]     FIPAH, Members, https://www.fipah.be/fr/membres/ (last visited Apr. 11, 2024).

[50]     NCAA, Welcome, https://ncca.no/ (last visited Apr. 11, 2024).

[51]     ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/ (last visited Apr. 11, 2024).

[52]     Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres (last visited Apr. 11, 2024).

[53]     ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura (last visited Apr. 11, 2024).

[54]     SACA, Member Companies, https://www.saca.se/medlemmar.html (last visited Apr. 11, 2024).

[55]     Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/ (last visited Apr. 11, 2024).

trade association ("KUB").[56] Euclid is also a member of KUB.[57]

75.     Each of these associations, in turn, also belongs to the European Engineering Consultancy Associations ("EFCA") headquartered in Brussels, Belgium.[58]

76.     The EFCA describes itself as "a partnership of 13 National Admixture Associations, formed in 1984 in order to represent the interests of the industry."[59]

77.     As with the various national trade associations, the boards and committees of the EFCA are also comprised of individuals employed by the Defendants. For example, the current EFCA Executive Board is made up of President Gianluca Bianchin, Vice Presidents Thomas Hirschi and Osman Ilgen, Sustainability Committee Chair Nihal Kinnersley, and Technical Committee Chair Francesco Surico.[60]

78.     Thomas Hirschi worked at Sika.[61] Osman Ilgen was Managing Director at Chryso and is now a Vice President at Saint-Gobain Group.[62] Mr. Ilgen also currently serves as President of KUB.[63] Nihal Kinnersley has worked at GCP since March of 2016 and as a Product Stewardship Director at Saint-Gobain Group since July of 2023.[64]

---

[56]     KUB, About Us, https://kub.org.tr/hakkimizda/ (last visited Apr. 11, 2024).

[57]     *Id.*

[58]     EFCA, About Us, https://www.efca.info/about-us/ (last visited Apr. 11, 2024).

[59]     *Id.*

[60]     EFCA, Structure, https://www.efca.info/about-us/efca-structure/ (last visited Apr. 11, 2024).

[61]     Thomas Hirschi, LinkedIn Profile, https://www.linkedin.com/in/thomas-hirschi-01159b83/?originalSubdomain=ch (last visited Apr. 11, 2024).

[62]     Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr (last visited Apr. 11, 2024).

[63]     *Id.*

[64]     Nihal Kinnersley, LinkedIn Profile, https://www.linkedin.com/in/nihal-kinnersley-ba506b22/?originalSubdomain=uk (last visited Apr. 11, 2024).

**C.**   **Prices for Defendants' CCAs Rose Precipitously During the Class Period**

79.   During the Class Period Defendants raised their prices for CCAs, including through surcharges.

80.   An investor report published by Saint-Gobain Group in February of 2021 cited "[u]pward trends in sales prices" as a reason for the company's sales growth in 2020.[65] The investor report published one year later noted an "acceleration in prices in all segments" in 2021.[66] The report stated that Saint-Gobain Group had exhibited "strong pricing power and decisive execution" in raising its prices by as much as 10%, in line with the industry trend.[67] In the Americas, Saint-Gobain's prices increased by 18.6% from October of 2019 to October of 2021.[68]

81.   In February, 2019, Sika CEO Paul Schuler announced that Sika would raise its prices for the second time that year: "We are going to increase prices further. We have increased prices in January and we will do it again in March."[69]

82.   On November 13, 2020, Master Builders Group announced that it would raise its CCA prices up to 10%, effective immediately.[70]

---

[65]   SAINT-GOBAIN, *FY 2020 Results and Outlook* (Feb. 26, 2021), at 19, https://www.saint-gobain.com/sites/saint-gobain.com/files/fy-2020-ang-a_0.pdf (last visited Apr. 11, 2024).

[66]   SAINT-GOBAIN, *FY 2021 results and outlook* (Feb. 25, 2022), at 17, https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/FY2021_ENG.pdf  (last visited Apr. 11, 2024).

[67]   *Id.*

[68]   SAINT-GOBAIN, *Continued dynamic organic growth in the third quarter* (Oct. 28, 2021) CP_CA_9M_2021_VA.pdf (saint-gobain.com) (last visited Apr. 11, 2024).

[69]   REUTERS, *Sika raises prices to counter jump in raw material costs* (Feb. 22, 2019 4:45 AM EST), https://www.reuters.com/article/sikaresults-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/ (last visited Apr. 11, 2024).

[70]   SIKA, *Master Builders Solutions To Increase Prices For Construction Chemicals* (Nov. 13, 2020), https://mbcc.sika.com/en-in/about-us/news/price-increase-announcement (last visited Apr. 11, 2024).

ALM | LAW.COM RADAR

83.     On July 20, 2021, Masters Builders Group announced that it would be increasing previously imposed surcharges on its products, including on CCAs, from six percent (6%) to nine percent (9%).[71]

84.     On November 29, 2021, GCP announced that it would raise its CCA prices up to 10% for North American customers, effective in January of 2022.[72]

85.     On January 14, 2022, Master Builders Group announced that it would be increasing previously imposed surcharges on its products, including on CCAs.[73]

86.     In January of 2022, Sika announced it would be increasing its previously imposed surcharges on its products, including CCAs, from 16% to 20%.[74]

87.     Defendants' price increases and surcharges resulted in the prices for CCAs sold in the United States and its territories to increase dramatically during the Class Period.

88.     Defendants justified their price increases during the Class Period by citing increases in input costs and supply chain constraints. However, Defendants' material price increases for and imposition of surcharges on CCAs cannot be explained by normal market forces. For example, the increase in freight costs during Covid was short-lived, stabilizing after a few months before

---

[71]     Letter from Konrad Wernthaler, Senior Vice President at Master Builders Solutions, to Customers (July 20, 2021), https://www.negwer.com/Portals/0/Documents/Vendor%20News/2021%20Price%20Increases/2021_07_20_Master%20Builders%20Solutions%20Surcharge%20Letter_EN.pdf?ver=2021-07-21-080522-810 (last visited Apr. 11, 2024).

[72]     CONCRETE PRODUCTS, *Raw material, freight costs drive GCP admixture price increase* (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-price-increase/ (last visited Apr. 11, 2024).

[73]     Letter from Konrad Wernthaler, Senior Vice President at Master Builders Solutions, to Customers (Jan. 14, 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf [*sic*] (last visited Apr. 11, 2024).

[74]     Letter from Michal Mastro, Vice President at Sika, to Customers (Jan. 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf (last visited Apr. 11, 2024).

decreasing.

89.     Sika CFO Adrian Widmer admitted during an earnings call in February of 2020 that the impact of increases in raw material costs was "only … marginal," and that Sika had continued to improve its material margin by remaining "very much … focused on pricing."[75] During another earnings call one year later, Widmer explained that Sika's material margin of 54.8% in 2020 was "supported by decreasing raw material costs … in combination with disciplined pricing," which allowed it to "add[] 50 basis points in price effect."[76]

90.     Sika CEO Thomas Hasler explained that the "remarkable" increase in Sika's material margin in the first half of 2023 was "a result of our pricing discipline and excellence."[77] Sika's 2023 Half-Year Report, reported "disciplined sales price management," along with lower costs, as improving its gross margin.[78]

91.     In an October 28, 2021 press release, Saint-Gobain Group cited a "[c]onstant focus

---

[75]     Sika AG, Full Year 2019 Earnings Call Transcript (Feb. 21, 2020), https://seekingalpha.com/article/4326363-sika-agsxyay-ceo-paul-schuler-on-full-year-2019-results-earnings-call-transcript. *See also* SIKA MEDIA AND INVESTOR PRESENTATION, *Record Results in 2019* (Feb. 21, 2020), https://www.sika.com/dam/dms/corporate/media/glo-annual-report-2019-full-year-results.pdf at 29 ("MATERIAL MARGIN / GROSS RESULT . . . Driven by solid pricing and structural savings; Flattening/decreasing raw material cost in 2nd half 2019") (last visited Apr. 11, 2024).

[76]     Sika AG, Q4 2020 Earnings Call Transcript (Feb. 20, 2021), https://seekingalpha.com/article/4407686-sika-ag-sxyayceo-paul-schuler-on-q4-2020-results-earnings-call-transcript . *See also* SIKA MEDIA AND INVESTOR PRESENTATION, *Record Results for Profit and Cash Flow – SIKA Strong in Year of Coronavirus* (Feb. 19, 2021), at 31 https://www.sika.com/dam/dms/corporate/media/glo-annual-report-2020-full-year-results.pdf (last visited Apr. 11, 2024).

[77]     Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q22023-earnings-call-transcript (last visted Apr. 11, 2024).

[78]     *Sika Half-Year Report (2023)*, at 19, https://www.sika.com/content/dam/dms/corporate/media/glo-hy-2023-half-year-report.pdf (last visited Apr. 11, 2024).

on the price-cost spread" and "strong pricing discipline, amid strong inflation" as among its "strategic priorities" for 2021.[79]

92. In July, 2023 an analyst asked RPM's Sullivan what had driven the "significant increase" in profit margin for RPM's construction segment in the fourth quarter. Sullivan noted Euclid Group's pricing discipline: "[W]e had a few distributors that were hinting at … we can boost some product if you discount. And I think we held our pricing and held our discipline."[80]

### D.  The Structure and Characteristics of the Market for CCAs Support the Existence of a Conspiracy

93. Because the manufacture of CCAs is highly concentrated, with the Defendants controlling the vast majority of production, this market is highly susceptible to collusion.

94. Collusion is "more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories."[81]

95. Defendants Sika, Saint-Gobain Group, and Master Builders Group, are among the largest producers of CCAs in the world.[82]

96. Other manufacturers of CCAs do not meaningfully compete with Defendants. When considering a 2022 proposed acquisition by Sika of MBCC Group, the CMA noted that "[t]he majority of market participants viewed the Parties as the strongest suppliers active in the

---

[79] SAINT-GOBAIN, Press Release *Continued dynamic organic growth in the third quarter* (Oct. 28, 2021), pp. 4-5, https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf (last visited Apr. 11, 2024).

[80] REFINITIV STREETEVENTS, *Edited Transcript, RPM.N - Q4 2023 RPM International Inc Earnings Call*, p. 13 (Jul. 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf (last visited Apr. 11, 2024).

[81] DOJ ANTITRUST PRIMER, *supra* note 3, at 5.

[82] INDUSTRY ARC, *Concrete Admixtures Market—Forecast (2023–2028)*, https://www.industryarc.com/Report/15114/concrete-admixtures-market.html (last visited Apr. 11, 2024).



UK" and that "customers also identified the Parties as two of a small number of suppliers that have the scale and infrastructure to meet their requirements given the volumes of admixtures they require and the need for product to be delivered to their large network of production sites."[83]

97.     In its analysis, the CMA "considered the current competitive constraint exerted by other suppliers and found that other than the newly merged Saint-Gobain/GCP, all other existing suppliers would exert only a limited constraint on the merged Parties."[84]

98.     Several of these other, smaller manufacturers of CCAs told the CMA that even if they wanted to compete with SIKA and MBCC, they would not be able to do so effectively because of challenges in scaling up their operations, as well as the reluctance of CCA purchasers to switch from their existing CCA manufacturer(s).[85]

99.     These high barriers to entry and expansion include costs associated with: (1) the need for economies of scale in development, production, sales, and distribution; (2) obtaining access to local production of chemical admixtures; (3) investment in product research and development, including testing new chemical admixture products; (4) obtaining access to raw materials; (5) establishing a reputation to penetrate existing relationships between suppliers and customers; and (6) building or acquiring large production areas and storage facilities.[86]

100.     The CMA, in determining that the acquisition by Sika AG of MBSD would be

---

[83]     CMA, *Anticipated acquisition by Sika AG of MBCC Group, Summary of Final Report*, at 3-4 (Dec. 15, 2022), https://assets.publishing.service.gov.uk/media/639a13348fa8f50ddbf7a65c/Sika-MBCC_Final_Report_Summary.pdf (last viewed Apr. 11, 2024).

[84]     *Id*. at 4.

[85]     CMA, *Anticipated acquisition by Sika AG of MBCC Group, Provisional findings report,* at 58-63 (Oct. 25, 2022), https://assets.publishing.service.gov.uk/media/6359185b8fa8f557d9a2d57e/FULL_TEXT._03.pdf (last visited Apr. 11, 2024).

[86]     *Id.* at 60-63.

anticompetitive, noted as follows: "There are significant barriers to entry and expansion and, although a number of suppliers have expansion plans, these will not have a significant enough effect on the structure of the market to prevent an SLC ["Substantial Lessening of Competition"] even if these plans materialise."[87]

101.     The high barriers to entry in the manufacture of CCAs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

102.     Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand for CCAs: (a) a lack of substitute goods, (b) the essential nature of CCAs in cement, concrete, and mortar, and (c) CCAs being a small portion of the overall cost of the final goods.

103.     The unconcentrated nature of the demand side of the CCA market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion.

104.     In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States and its territories.[88]

105.     Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

---

[87]     *Id*. at 66.

[88]     UNITED STATES CENSUS BUREAU, *3273: Cement and concrete product manufacturing*, https://data.census.gov/profile/3273_-_Cement_and_concrete_product_manufacturing?g=010XX00US&n=3273 (last viewed Apr. 11, 2024).



106. The DOJ has also recognized that "the probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured" and that "[t]he more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure."[89]

107. The lack of substitute goods makes this market susceptible to collusion.

### E. Defendants Fraudulently Concealed Their Conduct

108. The statute of limitations on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023, when the EC announced its investigation into the Defendants and that it was coordinating with the TCA, CMA, and DOJ.

109. Prior to this announcement, Agavero had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place it on notice of the claims set forth herein.

110. Prior to October 17, 2023, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for CCAs and, thus, Agavero did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date.

111. Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct secret from customers and government authorities. Agavero reasonably believed it was purchasing CCAs in a competitive industry.

### V.    CLASS ACTION ALLEGATIONS

112. Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a),

---

[89]    DOJ ANTITRUST PRIMER, *supra* note 3, at 5.

(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased CCAs directly from any of the Defendants or their subsidiaries or affiliates during the period beginning no later than May 11, 2018 until the date on which a class is certified in this case. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators, and the court and its staff.

113. ***Numerosity.*** While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

114. ***Commonality.*** Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

> (a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of CCAs in the United States and its territories;
>
> (b) The identity of the participants in the alleged conspiracy;
>
> (c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> (d) Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;
>
> (e) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;
>
> (f) The effect of the alleged conspiracy on the price of CCAs during the Class Period;

    (g)    Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

    (h)    The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

    (i)    The appropriate class-wide measure of damages.

115. *Typicality.* Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for CCAs from Defendants and/or their co-conspirators.

116. *Adequacy.* Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

117. *Predominance.* The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

118. *Superiority.* Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of

separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    INTERSTATE TRADE AND COMMERCE

119.    Billions of dollars of transactions in CCAs are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

120.    Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

121.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for CCAs in the United States.

122.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of CCAs sold in the United States, the prices of CCAs would have been determined by a competitive, efficient market.

## VII.    ANTITRUST INJURY

123.    Defendants' antitrust conspiracy had the following effects, among others:

    (a)    Price competition has been restrained or eliminated with respect to the pricing of CCAs;

    (b)    The prices of CCAs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    (c)    Purchasers of CCAs have been deprived of the benefits of free and open competition; and

    (d)    Purchasers of CCAs paid artificially inflated prices.

124.     The purpose of the conspiratorial and unlawful conduct of Defendants and their coconspirators was to fix, raise, stabilize, and/or maintain the price of CCAs.

125.     The precise amount of the overcharge impacting the prices of CCAs paid by Agavero and the Class can be measured and quantified using well-accepted models.

126.     By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for CCAs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.     CLAIM

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)
### (Conspiracy in Restraint of Trade)

127.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

128.     From at least May 11, 2018, until the date on which any Class is certified, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regard to CCAs in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

129.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for CCAs, including surcharges on CCAs, in the United States and its territories.

130.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including the following:

35

(a) Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs, sold in the United States and its territories;

(b) Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs, sold in the United States and its territories; and

(c) Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

131. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs.

132. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for CCAs has been restrained, suppressed, and/or eliminated;

(b) Prices for CCAs, including surcharges on CCAs, provided by Defendants and their co-conspirators have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c) Plaintiff and members of the Class who purchased CCAs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

133. Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for CCAs purchased from Defendants and their coconspirators than they would have paid and will pay in the absence of the conspiracy.

134. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

135. Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants to prevent and restrain the violations alleged herein.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and that acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent,

subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

     F.     That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## X.    <u>JURY DEMAND</u>

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 24, 2024

Respectfully submitted,

<u>/s/ Roberta D. Liebenberg</u>

Roberta D. Liebenberg (PA Bar No. 31738)
Gerard A. Dever (PA Bar No. 85291)
Mary L. Russell (PA Bar No. 58581)
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
Email: rliebenberg@finekaplan.com
Email: gdever@finekaplan.com
Email: mrussell@finekaplan.com

Linda P. Nussbaum*
Peter Moran*
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: (917) 438-9189
Email: lnussbaum@nussbaumpc.com
Email: pmoran@nussbaumpc.com

Larry D. Lahman*
Roger L. Ediger*
**MITCHELL DECLERCK, P.L.L.C.**
202 West Broadway Avenue
Enid, OK 73701
Telephone: (580) 498-1782
Email: ldl@mdpllc.com
Email: rle@mdpllc.com


*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*